## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **N.C.**, a Minor, by his Father and Natural Guardian **T.C.**, and on behalf of all others similarly situated, | )<br>)<br>)<br>) |
| *Plaintiff*, | ) Case No.: 1:19-cv-08779 |
| v. | )<br>) |
| **JUUL LABS, INC.**, | )<br>) |
| *Defendant*. | ) **JURY TRIAL DEMANDED**<br>) |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff  N.C, a minor, by and through his father and natural guardian T.C., brings this Class Action Complaint against Defendant JUUL Labs, Inc. ("JUUL"), on behalf of himself and all others similarly situated who used a JUUL e-cigarette or related JUUL product in the State of New York.  Plaintiff alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters based on the investigation of counsel.

## <u>INTRODUCTION</u>

1.      Beginning at the age of 15, N.C. began "JUULing."

2.      JUULing refers to the use of specific electronic vaping devices made by Defendant JUUL Labs.



3.  The user loads a "JUULpod," filled with a flavored liquid containing nicotine and other chemicals, into the JUUL vaping device.  Powered by a battery that is charged through a USB port, the JUUL vaping device heats the liquid, converting the liquid into a vapor that the user breathes in through the mouth like someone smoking a cigarette.



4.  Through its marketing and promotional efforts, including a strong social media presence on platforms popular with young people, JUUL vaping devices and JUULpods were N.C.'s first real and consistent exposure to nicotine.

5.      N.C. understood from JUUL Labs' marketing and promotional efforts that the JUULpods he was using would not be harmful to his health and were not addictive.  At no time has he understood or appreciated the amount of nicotine he was taking in.

6.      And he is not alone: "Two-thirds of JUUL users ages 15 through 24 "do not know that JUUL always contains nicotine."[1]

7.      The Surgeon General and other governmental and health authorities have "singled out" JUUL Labs and its products for fueling the "epidemic" of "youth vaping," they being largely responsible for driving the "largest ever recorded [increase in substance abuse] in the past 43 years for any adolescent substance use outcome in the U.S."[2]

## PARTIES

8.      Plaintiff brings this action individually and on behalf of a class of persons consisting of similarly situated New York residents, as set forth below.

9.      T.C. and N.C. reside in Oneida County, New York and are citizens of the state of New York.

10.     T.C. is the father and legal guardian of N.C., who was 15 years old, a freshman in high school, when he first started using JUUL in 2017.  At first, N.C. thought vaping with JUUL was fun and did not understand or appreciate that JUULpods contained nicotine.  Over a relatively short period of time, N.C. was unable to stop using JUUL.

---

[1] Surgeon General's Advisory on E-Cigarette Use Among Youth, Dec. 18, 2018, https://e-cigarettes.surgeongeneral.gov/documents/surgeon-generals-advisory-on-e-cigarette-use-among-youth-2018.pdf.

[2] Surgeon General Warns Youth Vaping Is Now An "Epidemic," Dec. 18, 2018, https://www.npr.org/sections/health-shots/2018/12/18/677755266/surgeon-general-warns-youth-vaping-is-now-an-epidemic; University of Michigan Institute for Social Research, *National Adolescent Drug Trends in 2018*, Dec. 17, 2018, http://monitoringthefuture.org/pressreleases/18drugpr.pdf.

11.    Through using JUUL Labs' products and believing to be true the marketing and promotional messaging JUUL Labs disseminated, N.C. became addicted to nicotine.

12.    N.C. had seen JUUL Labs' products advertised on social media and other sites popular with his peers, including in YouTube videos and on Instagram, where JUUL was promoted as being used by young, attractive people who were depicted as having fun.

13.    He also saw JUUL Labs' advertisements for its products at gas stations, including large window stickers on the front windows of gas station, with the products themselves offered for sale in stand-alone cases with signs advertising discounted pricing and "multi-packs."

14.    To N.C., none of the advertisements that he saw discouraged him from using JUUL or warned him of the extent of health hazards associated with using JUUL. None of the marketing or promotional efforts that N.C. saw when he began using JUUL Labs' products disclosed the existence and/or amount of nicotine in JUULpods.

15.    None of the marketing and promotional efforts alerted N.C. to the patented "nicotine salt" formulation that was in each JUULpod he consumed that would lead his body to absorb more nicotine, more quickly, than it would were he to just smoke cigarettes.

16.    Plaintiff's father did not learn that N.C. was JUULing until more than one year after he started due to the way in which the JUUL vaping device is made, allowing it to be easily hidden due to its size and the nature of its use. Plaintiff's father noticed a gradual change in N.C.'s personality and eventually learned that N.C. was using JUULpods. At the time Plaintiff's father discovered that N.C. was JUULing, N.C. was using as many as four pods per week. N.C. had around that time tried to quit, but was unsuccessful.

17.    Plaintiff's father immediately encouraged N.C. to stop using JUULpods due to the likelihood of suffering adverse health effects at such a young age. It soon became clear to

Plaintiff's father that N.C. was addicted to using JUULpods, and specifically the nicotine contained therein.

18.    Plaintiff's father has consistently encouraged N.C. to stop using JUUL and has taken action to try to get him to stop.  However, although N.C. has made efforts to reduce the use of JUULpods, he has been unable to stop.  Throughout the time period that N.C. has attempted to stop JUULing, N.C. has displayed uncharacteristic behaviors associated with trying to stop JUULing, including becoming increasingly angry, irritable, and anxious, which at times has affected the relationship between N.C. and his father.

19.    As a direct and proximate result of JUUL Labs' conduct, N.C. (i) is addicted to nicotine; (ii) has been exposed to toxic chemicals like formaldehyde and propylene glycol, among others; (iii) has experienced adverse physiological, emotional, and mental changes; and (iv) has sustained economic harm that would not have resulted had JUUL Labs informed him of the consequences of using its products.

### JUUL Labs

20.    JUUL Labs is, and was at all relevant times, a Delaware corporation having its principal place of business in California.  JUUL designs, manufactures, markets, promotes, distributes, and sells JUUL branded vaping devices and JUULpods.

21.    Since its launch in 2015, JUUL Labs has become the dominant manufacturer in the electronic nicotine delivery system ("ENDS") market in the United States.  In 2018, JUUL Labs amassed more than $1 billion in revenue, up 700% from 2017.  Also in late 2018, leading U.S. cigarette manufacturer Altria bought a 35% stake in JUUL Labs for $12.8 billion.

## JURISDICTION AND VENUE

22.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, is a class action in which at least one plaintiff is a citizen of a state different from the Defendant, and the proposed class consists of more than 100 members.

23.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred here.

## BACKGROUND

24.     The JUUL device resembles a USB flash drive, it can re-charge in a laptop computer, and it can be concealed in the hand.  It measures about 3 ½ inches long and about ½ an inch wide.



25.     The vapor that is exhaled quickly dissolves into the air and its odor is subtle and faintly sweet, unlike the typically acrid smell of "combustible" tobacco.

26.     The thin, rectangular JUUL device consists of an aluminum shell, a battery, a magnet (for the USB-charger), a circuit board, an LED light, and a pressure sensor.

27.     A light embedded in the JUUL device is the battery level indicator and lights up in a "party mode" display of colors when the device is waved around.

28.     Each JUULpod encases 0.7 milliliters of JUUL Labs' patented nicotine liquid solution and a coil heater.

29.     When the sensor in the JUUL device detects use, the heating element activates, which in turn converts the nicotine liquid solution from the JUULpod into a vapor consisting principally of nicotine, benzoic acid, glycerin, and propylene glycol.

30.     The electronics within the JUUL device are designed to determine the amount of nicotine that the user inhales with each use. By altering the temperature, puff duration, and airflow, among other things, JUUL Labs precisely controls the amount of nicotine that is delivered with each breath taken from the device.

31.     Because of the JUUL device's design, the liquid from JUULpods can be consumed quickly, so that users can inhale more nicotine more quickly from the JUUL device than they can from conventional cigarettes.

32.     The JUUL device can deliver a large amount of nicotine to the body quickly, and easily.

33.     JUUL Labs mixes its nicotine with benzoic acid, creating a patented "nicotine salt" with a pH lower than that of the "freebase" nicotine generally used in conventional cigarettes and even other vaping devices.

34.     With the addition of benzoic acid, the nicotine can be inhaled without the initial harshness, or "throat hit" that is concomitant with cigarette smoking. The JUUL device gives a smoother and more pleasant inhalation experience, all while delivering a higher concentration of nicotine than cigarettes and with a more efficient rate of absorption.

35.     Studies have shown that the "decrease in the perceived harshness" of the nicotine inhalation leads to "a greater abuse liability."[3]

---

[3] Anna K. Duell, et al., *Free-Base Nicotine Determination in Electronic Cigarette Liquids by $^1H$ NMR Spectroscopy*, Chem. Res. Toxicol., May 18, 2018, at 431-34, https://pubs.acs.org/doi/10.1021/acs.chemrestox.8b00097.

36.     Not only is the nicotine from JUUL Labs' products more easily consumed, there is more of it for consumption.

37.     In direct contrast to JUUL Labs' representations that its JUULpods contain about the same amount of nicotine as a pack of conventional cigarettes, studies have shown that JUULpods contain significantly higher concentrations of nicotine than cigarettes and absorption rates that are up to four times higher than those of cigarettes.[4]

38.     For instance, where one cigarette delivers, overall, 5-7% of its actual nicotine content, an average pack of cigarettes would deliver between 19-27 mg of nicotine to the smoker.[5]

39.     This is less than half of the amount of nicotine that a JUULpod provides, and adding to that a higher delivery efficiency (82% a rough estimate[6]), JUULpods are delivering substantially higher amounts of nicotine to users' bloodstreams and brains than the cigarettes to which JUUL Labs claims equivalency.

40.     And that is just going by the nicotine amounts that JUUL Labs represents its JUULpods as having.  Studies have also shown that JUULpods advertised as having "5% strength" actually contain concentrations of 6.2% nicotine salt, and other studies have shown even higher concentrations than that.[7]

---

[4] *See, e.g.,* Samantha M. Reilly, et al., *Free Radical, Carbonyl, and Nicotine Levels Produced by Juul Electronic Cigarettes*, Nicotine & Tobacco Research, Sep. 2019, at 1274-78; *E-Cigarettes*, https://ec.europa.eu/health//sites/health/files/tobacco/docs/fs_ecigarettes_en.pdf.

[5] *See, e.g.,* Tameka S. Lawler, et al., *Surveillance of Nicotine and pH in Cigarette and Cigar Filler*, Tobacco Regulatory Science, Apr. 2017, at 101-116, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5628511/pdf/nihms897902.pdf; Martin J. Jarvis, et al., *Nicotine Yield From Machine-Smoked Cigarettes and Nicotine Intakes in Smokers: Evidence From a Representative Population Survey*, JNCI Journal of the National Cancer Institute, Feb. 2001, file:///C:/Users/smorgan/Downloads/Nicotine_Yield_From_Machine-Smoked_Cigarettes_and_.pdf.

[6] *See, e.g.,* Reilly, *Free Radical, Carbonyl, and Nicotine Levels*.

[7] *See, e.g., id.*; James F. Pankow, et al., *Benzene formation in electronic cigarettes*, PLoS ONE, Mar. 8, 2017, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5342216/pdf/pone.0173055.pdf.

41.    The U.S. Surgeon General has warned that the use of nicotine salts, like JUUL Labs' formulation, "which allow particularly high levels of nicotine to be inhaled more easily and with less irritation than the free-base nicotine that has traditionally been used," would be "of particular concern for young people, because it could make it easier for them to initiate the use of nicotine through these products and also could make it easier to progress to regular e-cigarette use and nicotine dependence."[8]

42.    When the "speed and magnitude of nicotine delivery" is a primary factor in getting someone addicted to nicotine,[9] JUUL Labs' patented nicotine salt formulation has paid off.[10]

43.    Considering the design of its device and the specially formulated contents of its JUULpods, JUUL Labs made its products specifically for the purpose of creating, nurturing, and sustaining nicotine addiction.

### Following in the Footsteps of Big Tobacco

44.    James Monsees, one of JUUL Labs' founders, described the cigarette as "the most successful consumer product of all time … an amazing product."  According to Monsees, JUUL Labs aimed to "deliver[] solutions that refresh the magic and luxury of the tobacco category"—a category of products that, as Monsees described, has "kill[ed] more than half of all people who use them long-term."

45.    Then, boasting: "That got us interested."[11]

---

[8] Surgeon General's Advisory, https://e-cigarettes.surgeongeneral.gov/documents/surgeon-generals-advisory-on-e-cigarette-use-among-youth-2018.pdf.

[9] Dorothy K. Hatsukami, et al., *Tobacco Addition: Diagnosis and Treatment*, The Lancet, Jun. 14, 2008, at 2027-38, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4732578/.

[10] Duell, *Free-Base Nicotine Determination*, at 433 (noting that JUUL Labs' use of nicotine salts "may well contribute to the current use prevalence of JUUL products among youth").

[11] Forbes India, *Billionaires-to-be: Cigarette breakers*, Oct. 12, 2018, http://www.forbesindia.com/article/leaderboard/billionairestobe-cigarette-breakers/51425/1.

46.    He and co-founder Adam Bowen turned to the "'Master Settlement Agreement,' [from] the big settlement where everyone was suing the tobacco companies and there was one master lawsuit that was kind of rolled together." He explained that "[o]ne of the results [of the tobacco litigation] was that a lot of tobacco industry documentation was mandated to become public," allowing them "to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."[12]

47.    Part of what JUUL Labs took from tobacco litigation documents were the industries' advertising strategies, *i.e.*, the same strategies that attracted people to the "the leading cause of preventable death."[13]

48.    In a 2018 interview, Monsees indicated that the design of JUUL's advertising had been informed by traditional tobacco advertisements and that even anti-tobacco research undertaken by the Stanford University School of Medicine about tobacco advertising had been quite useful to them.[14]

49.    Monsees later said that he had learned what "not to do" from those documents.[15] But JUUL Labs' actual marketing and promotional efforts speak for themselves; and what he really learned is evident from the similarity of JUUL Labs' advertising to that by Marlboro, "the most popular cigarette brand in the United States, with sales greater than the next seven leading

---

[12] Social Underground, PAX Labs: Origins with James Monsees, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/.

[13] Centers for Disease Control and Prevention ("CDC"), *Fast Facts*, https://www.cdc.gov/tobacco/data_statistics/fact_sheets/fast_facts/index.htm.

[14] Robert K. Jackler, et al, *JUUL Advertising Over Its First Three Years on the Market*, Jan. 21, 2019, at p. 27, http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.

[15] Time, *JUUL Executive Tells Lawmakers Electronic Cigarettes Were Never Intended for Teens*, Jul. 26, 2019, https://time.com/5635939/juul-james-monsees-testifies-electronic-cigarettes-teens/.

competitors combined … [and one of] [t]he three most heavily advertised brands … [that] continue

to be the preferred brands of cigarettes smoked by young people":[16]



[16] CDC, *Tobacco Brand Preferences*,
https://www.cdc.gov/tobacco/data_statistics/fact_sheets/tobacco_industry/brand_preference/index.htm.










  

  

50.     JUUL Labs mimicked other popular cigarette brands too:

 












51.    Stanford University School of Medicine researchers found not just similarities in the aesthetics between JUUL Labs' and old tobacco advertising, but themes too: "JUUL [Labs'] principal advertising themes have been closely aligned with that of traditional tobacco advertising (pleasure/relaxation, socialization/romance, flavors, cost savings and discounts, holidays/seasons, style/identity, and satisfaction)."[17]

52.    Lacking both nicotine and underage use warning messages, JUUL Labs' early

---

[17] *See, e.g.,* Jackler, *JUUL Advertising*, at p. 27.

marketing "featured patently youth-oriented imagery and messaging": [18]













53.      JUUL Labs "also sought individuals who were popular on the internet, enrolled them in JUUL's affiliate program, and compensated them for posting positive reviews while insisting that they not reveal the relationship."[19]  This included social media stars and influencers who used social media newsfeeds to promote JUUL Labs' products.

54.      JUUL Labs' own social media presence was expansive, and it was "highly correlated with [its] retail sales."

55.      Instagram accounts, with "artsy, professional-grade photographs to display its products" and "evoke lifestyle feelings such as relaxation, freedom and sex appeal," reached a quarter million followers; JUUL-related YouTube videos exceeded 100,000 "and engagement with the videos was high"; and in 2017 JUUL-related tweets averaged 30,565 every month.[20]

---

[19] *Id.*

[20] Jidong Huang, et al., *Vaping versus JUULing: how the extraordinary growth and marketing of JUUL transformed the US retail e-cigarette market*, Tob. Control 2019, at 150, https://tobaccocontrol.bmj.com/content/tobaccocontrol/28/2/146.full.pdf.

56.     Other marketing efforts included billboards, magazine advertising, launch parties, free samples, and promotional tours, as well as efforts to create associations with other popular products, identifying itself, for instance, as "the iPhone of e-cigarettes."

57.     JUUL Labs adopted the same themes used by Philip Morris and other "Big Tobacco" companies in their long-standing and far-reaching advertising campaigns to glamorize cigarette smoking while downplaying its addictiveness and adverse health effects.

58.     Although social media may not have been around for the cigarette companies to use at the time, its themes of independence, adventurousness, sophistication, glamour, athleticism, social inclusion, sexual attractiveness, thinness, popularity, rebelliousness, and "being cool" are the same themes that JUUL Labs has been associating with its products.

59.     The makers of Marlboro knew how important it was "to know as much as possible about teenage smoking patterns and attitudes" because "[t]oday's teenager is tomorrow's potential regular customer, and the overwhelming majority of smokers first begin to smoke while still in their teens."[21]

60.     Accordingly, Marlboro tracked youth behavior and preference; tested and employed marketing themes that resonated with youth; and directed sales promotions, events, and sponsorships toward youth.[22]

61.     Having learned from its predecessors, JUUL Labs has been doing exactly the same thing, reaching millions of teenagers and children—on purpose and for the same reason as "Big Tobacco" did—in the process.

---

[21] Philip Morris Special Report -- Young Smokers: Prevalence, Trends, Implications, and Related Demographic Trends, Mar. 31, 1981, at p. 6, http://tobaccofreedom.org/issues/documents/landman/youth/index.html

[22] *See, e.g., U.S. v. Philip Morris, et al.*, No. 99-cv-2496, Amended Final Opinion at p. 1006, 1072 (D.D.C. Aug. 17, 2006) (Kessler, J.).

**Deceptive Marketing**

62.    Despite making numerous revisions to its packaging since 2015, JUUL Labs did not add nicotine warnings until it was forced to do so in August 2018.  Many of JUUL Labs' advertisements also lacked a nicotine warning.

63.    JUUL Labs has falsely represented and fraudulently concealed material information about the addictive and adverse nature of its products, particularly material facts concerning nicotine content, addictiveness, and the physiological effects of the nicotine its JUULpods contained.

64.    Even when the presence of nicotine in JUULpods was known, JUUL Labs failed to disclose the truth about its amount, concentration, and effects.

65.    For instance, JUUL Labs has repeatedly represented that a single JUULpod contains an amount of nicotine equivalent to about a pack of cigarettes, suggesting then that the delivery, and effect, of the nicotine from each source is equivalent.  But JUUL Labs knows that it is not just the ***amount*** of nicotine, but its formulation, concentration, and the efficiency with which it is delivered into the bloodstream that determines the product's narcotic effect and risk of addiction.

66.    And JUUL Labs knows too that with the addition of benzoic acid and its "nicotine salt" formulation, its JUULpods accomplish more in terms of speed and amount of delivery—both of which affect the efficacy of its addictiveness—than one pack of cigarettes ever has.[23]

---

[23] *See, e.g.,* Neil L. Benowitz et al., *Nicotine Chemistry, Metabolism, Kinetics and Biomarkers,* Handbook of Experimental Pharmacology 1982: 29-60 (Oct. 13, 2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/.

67.    JUUL Labs' description of its JUULpods as having 3% or 5% strength is also intentionally misleading and at odds with the industry standard of reporting concentration by volume, leading retailers and consumers to believe it contains less nicotine than other formulations.

68.    Many interpret the percentages to mean, for example, that the nicotine content in a JUULpod with 5% strength is, by volume, 50 mg/mL, which is not an accurate conversion.  In truth, the concentration is nearly 20% higher: 59 mg/mL.

69.    JUUL Labs' products have not been approved as a smoking therapy measure or smoking cessation device, but the products are routinely advertised in connection with JUUL Labs' "Switch" campaign as a safer, healthier alternative to smoking cigarettes.

70.    The FDA found that JUUL Labs' marketing, advertising, labeling of its products in this way, as if they were "modified risk tobacco products," violated the Federal Food, Drug, and Cosmetic Act (the "FD&C Act").[24]

71.    Specifically: "JUUL has marketed its ENDS products as modified risk tobacco products because JUUL's labeling, advertising, and/or other actions directed to consumers … represent, or would be reasonably expected to result in consumers believing, that the products present a lower risk of tobacco-related disease or are less harmful than one or more other commercially marketed tobacco products; contain a reduced level of a substance or present a reduced exposure to a substance; and/or do not contain or are free of a substance or substances. JUUL adulterated its products … by selling or distributing them as modified risk tobacco products without an appropriate FDA order in effect … that permits such sale or distribution."[25]

---

[24] *See, e.g.,* U.S. Food & Drug Administration ("FDA"), *Warning Letter, JUUL Labs, Inc.*, Sep. 9, 2019, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019.

[25] *Id.*

72.     Further, as part of the same campaign, JUUL Labs offered "cost-savings" calculators to suggest that switching to JUUL branded products would save the consumer money over the continued purchase of conventional cigarettes.

73.     In truth, however, JUUL Labs knows, or should know, that smokers who "switch" to JUUL often increase their nicotine intake and consume more JUULpods or, alternatively, end up smoking cigarettes and JUULing.  Either way, the calculator shows savings that will likely never occur.

74.     Particularly alarming was the discovery that JUUL Labs developed programs in which it paid schools to allow JUUL Labs' representatives' access to students in class, and sponsored weekend programs and summer camps, with some students as young as third-graders, under the guise of offering instruction on "holistic health education" and other health related topics.

75.     According to testimony given at a recent Congressional hearing, JUUL Labs used this access to promote JUULing, telling students that its vaping devices and JUULpods were "totally safe."[26]

76.     Emails between JUUL Labs' employees referred to the company's sponsorship of, and involvement in, summer camps, youth programs, and school visitations as "eerily similar" to tactics previously taken by "Big Tobacco" companies that attended "fairs and carnivals where they distributed various branded items under the guise of 'youth prevention.'"[27]

---

[26] *See, e.g.,* Bloomberg, *JUUL Targeted Children at Schools and Online, U.S. House Panel Says*, Jul. 25, 2019, https://www.bloomberg.com/news/articles/2019-07-26/juul-targeted-children-at-schools-and-online-u-s-house-panel-says.

[27] *Id.*; The New York Times, *JUUL Targeted Schools and Youth Camps, House Panel on Vaping Claims*, Jul. 25, 2019, https://www.nytimes.com/2019/07/25/health/juul-teens-vaping.html.

77.    Authorized representatives for JUUL Labs told students and others that JUUL Labs' products were "much safer than cigarettes" and that not only would the FDA "approve [their products] any day," but that the FDA was "about to come out and say … JUUL was 99% safer than cigarettes and that would happen very soon."[28]

78.    Authorized representatives also represented JUUL Labs' products to be "totally safe" and, on at least one occasion, that a particular student "should mention JUUL to his nicotine-addicted friend because that's a safer alternative than smoking cigarettes, and it would be better for the kid to use." [29]

79.    In connection with its investigation into JUUL Labs' practices, the FDA determined that JUUL Labs "engaged in labeling, advertising, and/or other activities directed to consumers, in which JUUL explicitly and/or implicitly has represented that JUUL products are free of a substance, have a reduced level of or exposure to a substance, and/or that JUUL products present a lower risk of tobacco-related disease or are less harmful than one or more other commercially marketed tobacco products."[30]

80.    JUUL Labs knew that its products were not what they were being represented as.

81.    JUUL Labs knew that the marketing and promotional messaging reaching consumers concealed and/or omitted material information concerning the design, nature, and consequences of its products.

82.    JUUL Labs knew that the nicotine in its JUULpods was especially addictive because of the high dosage that each JUULpod contained, the strength of the nicotine's concentration, and

---

[28] *See, e.g.,* FDA, *Warning Letter,* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019.

[29] *Id.*

[30] *Id.*

how quickly the nicotine from the patented formulation in its JUULpods, including the benzoic acid additive, would be absorbed into users' bloodstreams.

83.    At all relevant times, and contrary to its messaging to consumers, JUUL Labs knew that its products eased users into addiction quickly and without warning, and it knew that its products would intensify, rather than lessen, the nicotine addiction in those already addicted.

<b>Adverse Effects</b>

84.    "Nicotine … causes addiction.  The pharmacologic and behavioral processes that determine [nicotine] addiction are similar to those that determine addition to drugs such as heroin and cocaine."[31]

85.    "Nicotine is well known to have serious systemic side effects in addition to being highly addictive.  It adversely affects the heart, reproductive system, lung, kidney, etc."[32]

86.    Both a stimulant and a relaxant, nicotine is absorbed into the body's bloodstream and goes to the brain where it binds to certain receptors and triggers the release of dopamine, acetylcholine, epinephrine, norepinephrine, vasopressin, serotonin, and beta endorphin.  This induces the feelings of pleasure, happiness, arousal, and relaxation, or the "buzz" that users often refer to.

87.    With regular nicotine use, however, the effect diminishes and more nicotine needs to be consumed to get that same "buzz."

88.    A study in the American Journal of Medicine found that, among young adults who did not smoke cigarettes, those who "vaped" were more than four times as likely than non-vapers to

---

[31] *The Health Consequences of Smoking: Nicotine Addiction: A Report of the Surgeon General*, 1988, at p. 9, https://profiles.nlm.nih.gov/NN/B/B/Z/D/.

[32] Aseem Mishra, et al., *Harmful Effects of Nicotine*, Indian J. Med. Paediatr Oncol., Jan.-Mar. 2015, at pp. 24-31, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4363846/.

start smoking traditional cigarettes within 18 months.[33]  And those who become smokers would likely die 10 years earlier than those who do not.[34]

89.    Inhaled into the lungs, nicotine is "rapidly absorbed into the pulmonary venous circulation.  The nicotine then enters the arterial circulation and moves quickly from the lungs to the brain."[35]

90.    At the brain, nicotine "exerts long-term, maturational effects at critical stages of brain development [for adolescents]."  Worse, while the effects may be long-term, the causal exposure needs only to be brief and to a low dose to "produce lasting change" in the brain itself and its process of development, impacting not just addiction, but potentially both cognition and emotional regulation as well.[36]

91.    "Nicotine exposure, increasingly occurring as a result of [vaping], may induce epigenetic changes that sensitize the brain to other drugs and prime it for future substance abuse." It can impact learning, memory, and attention too.[37]

92.    There is no dispute that nicotine exposure "harm[s] the developing brain," which continues developing through an individual's mid-20s, well after adolescence.[38]

---

[33] Brian Primack, et al., *Initiation of Traditional Cigarette Smoking after Electronic Cigarette Use Among Tobacco-Naive US Young Adults*, The Am. J. of Medicine, Nov. 2017.

[34] CDC, *Fast Facts*, https://www.cdc.gov/tobacco/data_statistics/fact_sheets/fast_facts/index.htm.

[35] Neal Benowitz, *Nicotine Addiction*, N. Engl. J. Med., Jun. 17, 2010, at pp. 1-2, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2928221/pdf/nihms227888.pdf.

[36] Menglu Yuan, et al., *Nicotine and the adolescent brain*, J. Physiol 593.16, Aug. 2015, at pp. 3398, 3405-06 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4560573/pdf/tjp0593-3397.pdf.

[37] *See, e.g., id.* at p. 3397; Surgeon General's Advisory, https://e-cigarettes.surgeongeneral.gov/documents/surgeon-generals-advisory-on-e-cigarette-use-among-youth-2018.pdf.

[38] *Id.*

93.    "Seizures or convulsions are known potential side effects of nicotine toxicity," and the FDA has received an "uptick in voluntary reports of adverse experiences" mentioning seizures occurring with vaping.[39]

94.    Nicotine itself is a carcinogen, as well as a toxic chemical associated with cardiovascular, reproductive, and immunosuppressive problems.  Exposure to nicotine produces an increased risk of coronary vascular disease and peripheral arterial disorders.

95.    Moreover, because the use of JUULpods introduces foreign substances in addition to nicotine into the lungs, prolonged use of JUUL branded products is believed to produce chronic obstructive pulmonary disease and other respiratory problems, just like traditional cigarette smoke. It also triggers immune responses associated with inflammatory lung diseases.

96.    Despite these dangers to users, JUUL Labs targeted youth in its marketing and promotional efforts even though such strategies had been determined to be unlawful were a tobacco company to use them.  JUUL Labs mined documents and information from the tobacco litigation proceedings to learn how "Big Tobacco" had been so successful in attracting minors to their products and ensuring their loyalty (and JUUL Labs' revenue) through nicotine addiction.

97.    JUUL Labs did not stop at unlawful marketing and promotion though, or even at just stocking its vaping devices with the standard, lesser amount of nicotine as other manufacturers. Instead, JUUL Labs specially formulated the liquids in JUULpods to deliver more nicotine in higher concentrations in a way that would make the delivery of all that nicotine quicker and easier to consume.[40]

---

[39] FDA, *Some E-cigarette Users Are Having Seizures, Most Reports Involving Youth and Young Adults*, Apr. 10, 2019, https://www.fda.gov/tobacco-products/ctp-newsroom/some-e-cigarette-users-are-having-seizures-most-reports-involving-youth-and-young-adults.

[40] *See, e.g.,* "On top of that, the e-liquid contains 50 mg of nicotine per ml of e-liquid. When you consider the fact that many e-cigarettes top out at just 16 mg, you can see what's going on here. The JUUL delivers a fast nicotine punch like no other e-cigarette on the market." (https://ecigone.com/e-

98.     JUUL Labs knew or should have known that Plaintiff and the members of the proposed class would be unable to discern, understand, and/or fully appreciate the physiological effects of the patented "nicotine salt" in JUULpods, or the scientific manipulations behind its formulation.

99.     Further, JUUL Labs knew or should have known that Plaintiff and the members of the proposed class would be unable to discern, understand, and/or fully appreciate from JUUL Labs' representations and omissions concerning its products what the actual nature and characteristics of its products were.

100.    JUUL Labs knows or should know that individuals who use its products are more than four times as likely to start smoking traditional cigarettes than those individuals who do not, and those who do become smokers will likely die 10 years before those who do not.  But JUUL Labs marketed and promoted its products anyway, intentionally targeting minors as well.

101.    JUUL Labs' unlawful practices, including deception, false promises, misrepresentation, and/or the concealment, suppression, and omission of material facts in connection with the sale, distribution, and/or advertisement of its products, were outrageous because of JUUL Labs' improper motive and/or its conscious disregard or reckless indifference to Plaintiff and the members of the proposed class rights and interests.

102.    In its conduct relating to the marketing, promotion, and sale of its products to minors, JUUL Labs committed intentional wanton, willful, and outrageous acts and/or acted with a reckless disregard for Plaintiff and the members of the proposed class rights and interests.

---

%20cigarette-reviews/juul-e-cigarette-review/); "Each official Juul pod contains a whopping 50mg of nicotine per milliliter of liquid (most other devices range from 3 to 30mg per milliliter) They're the tool of choice for people looking for a bigger hit of nicotine without the harsh taste …."
(https://www.vapor4life.com/blog/how-much-nicotine-is-in-a-Juul/); "The Juul Pods are manufactured with 50mg nicotine salts but deliver a smooth and flavorful vaping experience." (https://www.tracyvapors.com/collections/starter-kit/products/juul-starter-kit).

103.    As a result of JUUL Labs' conduct alleged herein, the jury should be permitted to return a verdict for an award of punitive damages that will serve to punish JUUL Labs and deter others from like conduct.

## CLASS ALLEGATIONS

104.    Plaintiffs bring this class action under Federal Rule of Civil Procedure 23 individually and on behalf of the following class of similarly situated persons:

> **All New York residents who purchased and/or used products manufactured by JUUL Labs or if, such person is a legal minor, the parent or legal guardian of the minor.  Excluded from the class are owners, officers, directors, employees, agents and/or representatives of Defendant and its parent entities, subsidiaries, affiliates, successors, and/or assigns, and the Court, Court personnel and members of their immediate families.**

105.    Excluded from the class is JUUL Labs, including any parent, subsidiary, affiliate or controlled person of JUUL Labs; JUUL Labs' officers, directors, agents or employees; the judicial officers assigned to this litigation, and members of their staffs and immediate families.

106.    The proposed class meets all requirements for class certification.

107.    The proposed class satisfies the numerosity standards because it is sufficiently numerous that joinder of all such persons in the class would be impracticable.

108.    There are questions of fact and law common to the proposed class, which predominate over any questions affecting only individual members. The questions of law and fact common to the proposed class arising from JUUL Labs' actions include, without limitation, the following:

(i)    whether, in marketing and selling its products, JUUL Labs misrepresented, concealed, omitted, and/or suppressed the dangers and risks to the health of persons using the products;

(ii)    whether JUUL Labs misrepresented in, and/or omitted from, its marketing,

advertisements, promotional materials and public statements, among other things, the safety and effects of its products;

(iii)    whether JUUL Labs failed to warn adequately of the risks of adverse effects of its products;

(iv)    whether JUUL Labs unlawfully marketed its products to minors;

(v)    whether JUUL Labs knew or should have known that the use of its products could lead to serious adverse health effects;

(vi)    whether JUUL Labs continued to manufacture, market, distribute, and sell its products in a manner inconsistent with its true knowledge of the products' dangerous and adverse nature;

(vii)    whether JUUL Labs knowingly omitted, suppressed, or concealed material facts about the unsafe and defective nature of its products from government regulators, the medical community, and/or the consuming public;

(viii)    whether JUUL Labs' conduct violated New York's Deceptive Trade Practices Act, N.Y. Gen. Bus. L. §§ 349 *et seq*.; and

(ix)    whether JUUL Labs' conduct warrants an award of punitive damages.

109.    The questions set forth above predominate over any questions affecting only individual persons, and a class action is superior, with respect to considerations of consistency, economy, efficiency, fairness and equity, to other available methods for the fair and efficient adjudication of this controversy.

110.    Plaintiffs' claims are typical of the claims of the class in that Plaintiffs' claims and those of the class all arise from, and as a result of, JUUL Labs' conduct.

111.    Plaintiffs are adequate representatives of the proposed class because they are

members of the class and their interests do not conflict with the interests of the other members of the proposed class that they seek to represent.

112. Plaintiffs and their undersigned counsel, who have extensive experience prosecuting complex litigation matters, including class actions, will fairly and adequately protect the interests of the proposed class.

113. The presentation of separate actions by individual class members could create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for JUUL Labs, and/or substantially impair or impede the ability of class members to protect their interests.

114. Maintenance of this action as a class action is a fair and efficient method for the adjudication of this controversy. It would be impracticable and undesirable for each member of the proposed class who suffered harm to bring a separate action.

115. In addition, the maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all class members.

Notice can be provided to class members by using techniques and forms of notice similar to those customarily used in other drug-related cases and complex class actions.

## **CAUSES OF ACTION**

### **Count One**
**Violation of New York Deceptive Trade Practices Act, N.Y. Gen. Bus. L. §§ 349 *et seq.***

116. Plaintiff incorporates by reference paragraphs 1 through 115 as though fully restated and set forth herein.

117. As set forth above, JUUL Labs engaged in unlawful practices, including deception, false promises, misrepresentation, and/or the concealment, suppression, and omission of material facts in connection with the sale, distribution, and/or advertisement of its products.

118.    The actions undertaken by JUUL Labs constitute deceptive acts and practices in the conduct of business in violation of the New York Deceptive Trade Practices Act.  N.Y. Gen. Bus. L. §§ 349 *et seq*.

119.    In connection with the above-described acts and practices, Plaintiff and the members of the proposed class purchased JUUL branded vaping devices and JUULpods for personal, family, or household purposes.

120.    Because of the unlawful, unfair, and/or fraudulent acts and/or business practices of JUUL Labs, Plaintiff and the members of the proposed class sustained an ascertainable loss of money and/or property.

121.    Such loss includes significant exposure to toxic substances, which may cause or contribute to causing disease and injurious physical conditions; nicotine addiction; and economic harm, in that Plaintiff and the members of the proposed class would not have purchased JUUL Labs' products or would have paid less for the products if they had known the true facts, and/or they paid a premium as a result of JUUL Labs' deceptive acts and/or business practices.

122.    JUUL Labs was aware that its actions constituted deceptive acts and practices such that JUUL Labs' violation of the New York Deceptive Trade Practices Act is knowing and willful.

<u>**Count Two**</u>
**Strict Products Liability—Design Defect**

123.    Plaintiff incorporates by reference paragraphs 1 through 122 as though fully restated and set forth herein.

124.    In the course of its business, JUUL Labs designed, engineered, manufactured, sold, and distributed its vaping devices and JUULpods.

125.    JUUL Labs intended that consumers use its vaping device to ingest the large amounts of concentrated nicotine and other chemicals contained in JUULpods.  And JUUL Labs

expected that its products would reach the consumer, and the products did reach the consumer, without substantial change in their condition.

126.    JUUL Labs' products, as designed, were sold in a defective condition unreasonably dangerous to the consumer or user because:

(i)    they create, nurture, and sustain an addiction to nicotine, a harmful substance;

(ii)    they were sold as a safer, healthier alternative to smoking cigarettes when, in fact, they contained more nicotine than cigarettes contained and could deliver that nicotine to the user's bloodstream quicker than cigarettes could, thereby creating and/or increasing the user's dependence on nicotine and JUUL branded products to feed the addiction;

(iii)    they would make users four times as likely to start smoking traditional cigarettes within 18 months than those who did not use JUUL Labs' products (and those who did start smoking traditional cigarettes would likely die 10 years earlier than those who did not);

(iv)    they put users at a greater risk of experiencing seizures and other physically debilitating conditions, including respiratory and cardiovascular problems, gastrointestinal problems, and nicotine poisoning;

(v)    their design for nicotine content, formulation, and delivery increases the propensity of abnormal electrical activity in the brain, producing "lasting change" impacting not just addiction, but potentially both cognition and emotional regulation as well;

(vi)    they make it easier for youth to initiate the use of nicotine and to progress to nicotine dependence; and/or

(vii)    they were sold with these harmful and injurious characteristics without regard for

the users' age or knowledge.

127.    In light of the above, the defective condition in which JUUL Labs sold its products was unreasonably dangerous when used in the reasonably anticipated manner.

128.    The risks inherent in the design of JUUL branded products outweigh significantly any benefits of such design.

129.    At all relevant times, JUUL Labs could have employed reasonably feasible alternative designs to prevent the harms and injuries set forth above.

130.    Plaintiff and the members of the proposed class was harmed and/or damaged as a direct and proximate result of the defective condition that existed at the time JUUL Labs' products were designed and when they were sold.

131.     Such harm and/or damage includes becoming addicted to nicotine; respiratory problems, bouts of anxiety, and coughing fits; other physiological, emotional, and mental injury; significant exposure to toxic substances that have caused or contributed to cause, and may yet cause or contribute to cause, disease and injurious physical conditions; and economic harm.

### Count Three
### Strict Products Liability – Inadequate Warning

132.    Plaintiff incorporates by reference paragraphs 1 through 131 as though fully restated and set forth herein.

133.    The JUUL Labs products manufactured and/or sold by Defendant were further designed defectively because the JUUL e-cigarettes and pods were not labeled with an adequate warning.

134.    The lack of an adequate warning label on JUUL Labs' products rendered these products defective and not reasonably safe for their intended or foreseeable use.

135.    The warning label on JUUL packaging and or/on JUUL's website was inadequate

and rendered JUUL vaping devices defective and not reasonably safe for their intended use.

136.    The warnings Defendant placed on the JUUL website and on JUUL packaging do not accurately convey the addicting nature of JUUL vaping devices and JUULpods. Specifically, the warnings to not inform potential users that these JUULpods contain levels of nicotine far higher than cigarettes commonly used at this time and that JUUL vaping devices are designed to deliver nicotine in a manner that made it far more likely users would become addicted to it.

137.    Moreover, many JUUL users including children such as Plaintiff were offered hits of JUUL vaping devices when the vaping devices were already opened and separated from the packaging and therefore the packaging was never seen by Plaintiff and Plaintiff did not visit the JUUL website until he had already become addicted to nicotine.

138.    Plaintiff and the members of the proposed class were harmed and/or damaged as a direct and proximate result of JUUL Labs' failure to provide adequate warnings at the time JUUL Labs' products were marketed and when they were sold.

**Count Four**
**Strict Products Liability – Manufacturing Defect**

139.    Plaintiff incorporates by reference paragraphs 1 through 138 as though fully restated and set forth herein.

140.    According to JUUL's labels, JUULpods are supposed to contain 60 mg/mL of nicotine.

141.    According to JUUL's '895 patent, JUULpods are intended to contain 4% benzoic acid by weight.

142.    The JUULpods manufactured by Defendants contained more than 60mg/mL nicotine.

143.    The JUULpods manufactured by Defendants contained more than 4% benzoic acid.

144.    As a result of these manufacturing defects, the already extreme risk of addiction posed by JUUL e-cigarettes was heightened to an extent that increased the already extreme addiction risks the JUUL e-cigarettes posed.

145.    These defects were a substantial factor in the nicotine addiction and injuries suffered by Plaintiff and the members of the proposed class.

### Count Five
### Negligence—Defective Product

146.    Plaintiff incorporates by reference paragraphs 1 through 145 as though fully restated and set forth herein.

147.    JUUL Labs failed to use ordinary care in the design, engineering, manufacturing, and sale of its vaping devices and JUULpods and/or failed to warn of the risk of harm, injury, and/or damage inherent in the use of its vaping devices and JUULpods.

148.    A legal duty existed on the part of JUUL Labs to exercise a reasonable degree of care to protect Plaintiff and the members of the proposed class from harm, injury, and/or damage caused by JUUL Labs' products.

149.    JUUL Labs knew or should have known that the defective condition in which it sold its products was likely to harm, injure, and/or damage Plaintiff and the members of the proposed class.

150.    JUUL Labs breached the duty it owed to Plaintiff and the members of the proposed class.  More specifically, JUUL Labs:

    (i)    created, nurtured, and sustained nicotine addiction in the users of JUUL Labs' products;

    (ii)    sold their products as a safer, healthier alternative to smoking cigarettes when, in fact, they contained more nicotine than cigarettes contained and could deliver that

nicotine to the user's bloodstream quicker than cigarettes could, thereby creating and/or increasing the user's dependence on nicotine and JUUL branded products to feed the addiction;

(iii)    made users of their products four times as likely to start smoking traditional cigarettes within 18 months than those who did not use JUUL Labs' products (and those who did start smoking traditional cigarettes would likely die 10 years earlier than those who did not);

(iv)    put users at a greater risk of experiencing seizures and other physically debilitating conditions, including respiratory and cardiovascular problems, gastrointestinal problems, and nicotine poisoning;

(v)    designed its products with a specific amount, formulation, and delivery system for nicotine knowing the harmful and addictive effects of nicotine and the other toxic chemicals in JUULpods;

(vi)    designed its products with a specific amount, formulation, and delivery system for nicotine knowing that the design would increase the propensity of abnormal electrical activity in the brain, producing "lasting change" impacting not just addiction, but potentially both cognition and emotional regulation as well;

(vii)    made it easier for youth to initiate the use of nicotine and to progress to nicotine dependence; and/or

(viii)    sold its products with these harmful and injurious characteristics without regard for the users' age or knowledge.

151.    Plaintiff and the members of the proposed class was harmed and/or damaged as a direct and proximate result of JUUL Labs' conduct and its products and/or JUUL Labs' failure to

warn of the risk of harm, injury, and/or damage inherent in the use of its vaping devices and JUULpods.

152.    Such harm and/or damage includes becoming addicted to nicotine; respiratory problems, bouts of anxiety, and coughing fits; other physiological, emotional, and mental injury; significant exposure to toxic substances that have caused or contributed to cause, and may yet cause or contribute to cause, disease and injurious physical conditions; and economic harm.

<u>Count Six</u>
**Breach of Express and Implied Warranty**

153.    Plaintiff incorporates by reference paragraphs 1 through 152 as though fully restated and set forth herein.

154.    JUUL Labs, when selling the JUUL vaping device and JUULpods, knew or should have known that Plaintiff and the members of the proposed class were seeking to purchase its products for a particular purpose – to vaporize and ingest the contents of the JUULpod without risk of developing a nicotine addiction or other injuries.

155.    Plaintiff and the members of the proposed class relied upon the skill and judgment of JUUL Labs when concluding that the JUUL vaping device and JUULpods would be fit for such a purpose.

156.    JUUL Labs impliedly promised that its products would be fit for this purpose and that this was an ordinary purpose for which JUUL Labs devices is normally used.

157.    JUUL Labs expressly warranted to Plaintiff and members of the proposed class that its products were fit for the particular purpose for which Plaintiff and the members of the propose class had a need, in order to induce Plaintiff and the members of the proposed class to purchase its products.

158.    JUUL Labs expressly warranted to Plaintiff and members of the proposed class that

its products were fir for the ordinary purpose for which JUUL vaping devices and JUULpods would be used.

159.    It was reasonably foreseeable that a person such as Plaintiff and members of the proposed class would purchase and use the JUUL Labs' products.

160.    The express and implied warranties made by JUUL Labs extend to Plaintiff and the members of the proposed class pursuant to New York U.C.C. § 2-318.

161.    The JUUL vaping device and JUULpods did not conform to JUUL Labs' express and implied warranties of fitness for ordinary use and did not conform to JUUL Labs' express and implied warranties of fitness for a particular purpose.

162.    Accordingly, the express and implied warranties made by JUUL Labs were breached.

### Count Seven
### Negligence

163.    Plaintiff incorporates by reference paragraphs 1 through 162 as though fully restated and set forth herein.

164.    JUUL Labs failed to use ordinary care in the marketing, promotion, and sale of its vaping devices and JUULpods and/or failed to warn of the risk of harm, injury, and/or damage inherent in the use of its vaping devices and JUULpods.

165.    A legal duty existed on the part of JUUL Labs to exercise a reasonable degree of care to protect Plaintiff and the members of the proposed class from harm, injury, and/or damage caused by JUUL Labs' products.

166.    More specifically, JUUL Labs owed a duty to Plaintiff and the members of the proposed class to exercise a degree of reasonable care in, among other things:

(i)    ensuring that its marketing and promotional efforts and activities were neither directed

to, nor targeted at, minors;

(ii)     ensuring that JUUL vaping devices and JUULpods were not sold and/or distributed to minors;

(iii)    ensuring that its products were not designed in a manner that made them unduly attractive to minors;

(iv)    designing a product that is not defective and unreasonably dangerous;

(v)     designing a product that will not addict youth or other users to nicotine, particularly where such youth or others are unaware of the products' nicotine content, concentration and/or effect; and

(vi)    adequately warning of any reasonably foreseeable adverse events with respect to its vaping devices and/or JUULpods.

167.    JUUL Labs knew or should have known that the nature and characteristics of its products would likely harm, injure, and/or damage Plaintiff and the members of the proposed class.

168.    JUUL Labs knew or should have known that its failure to warn of the nature and characteristics of its products would likely harm, injure, and/or damage Plaintiff and the members of the proposed class.

169.    JUUL Labs breached the duty it owed to Plaintiff and the members of the proposed class.  More specifically, JUUL Labs:

(i)      created, nurtured, and sustained nicotine addiction in the users of JUUL Labs' products;

(ii)     sold their products as a safer, healthier alternative to smoking cigarettes when, in fact, they contained more nicotine than cigarettes contained and could deliver that nicotine to the user's bloodstream quicker than cigarettes could, thereby creating

and/or increasing the user's dependence on nicotine and JUUL branded products to feed the addiction;

(iii)   made users of their products four times as likely to start smoking traditional cigarettes within 18 months than those who did not use JUUL Labs' products (and those who did start smoking traditional cigarettes would likely die 10 years earlier than those who did not);

(iv)   put users at a greater risk of experiencing seizures and other physically debilitating conditions, including respiratory and cardiovascular problems, gastrointestinal problems, and nicotine poisoning;

(v)   designed its products with a specific amount, formulation, and delivery system for nicotine knowing the harmful and addictive effects of nicotine and the other toxic chemicals in JUULpods;

(vi)   designed its products with a specific amount, formulation, and delivery system for nicotine knowing that the design would increase the propensity of abnormal electrical activity in the brain, producing "lasting change" impacting not just addiction, but potentially both cognition and emotional regulation as well;

(vii)   failed to adequately warn of any reasonably foreseeable adverse events with respect to its vaping devices and/or JUULpods;

(viii)   made it easier for youth to initiate the use of nicotine and to progress to nicotine dependence; and/or

(ix)   sold its products with these harmful and injurious characteristics without regard for the users' age or knowledge.

170.   Plaintiff and the members of the proposed class were harmed and/or damaged as a

direct and proximate result of JUUL Labs' conduct and its products and/or JUUL Labs' failure to warn of the risk of harm, injury, and/or damage inherent in the use of its vaping devices and JUULpods.

171.    Such harm and/or damage includes becoming addicted to nicotine; respiratory problems, bouts of anxiety, and coughing fits; other physiological, emotional, and mental injury; significant exposure to toxic substances that have caused or contributed to cause, and may yet cause or contribute to cause, disease and injurious physical conditions; and economic harm.

<u>Count Eight</u>
**Fraudulent Concealment and/or Omission**

172.    Plaintiff incorporates by reference paragraphs 1 through 171 as though fully restated and set forth herein.

173.    None of the marketing or promotional efforts that Plaintiff and the members of the proposed class saw when he began using JUUL Labs' products disclosed the material facts concerning the existence, amount, or concentration of nicotine in JUULpods, or that the patented "nicotine salt" formulation would make the consumption of the nicotine in JUULpods so much easier than the nicotine from a cigarette.

174.    JUUL Labs concealed and/or omitted the material facts that the nicotine from its JUULpods would not only be easier to consume than the nicotine from a conventional cigarette on account of JUUL Labs' patented "nicotine salt" formulation, but that more nicotine would be consumed than would be from a conventional cigarette.

175.    JUUL Labs had a duty to disclose these material facts because of its superior knowledge and information about, among other things:

(i)    the addition of the benzoic acid to the nicotine formulation to take out the initial harshness of, or "throat hit" from, the inhalation of nicotine in a cigarette so that

the user would have a smoother and more pleasant inhalation experience, suggesting that JUUL Labs' products were safer and/or less harmful than cigarettes;

(ii)     the meaning and significance of the "3% strength" and "5% strength" designations for its JUULpods, obscuring the actual amount and concentration of the nicotine JUULpods contained;

(iii)    that the "decrease in the perceived harshness" of the nicotine inhalation would lead to a "a greater abuse liability";

(iv)     that one of its JUULpods would deliver twice as much nicotine as a pack of cigarettes, making its products that much more addictive; and

(v)      that the speed and magnitude with which nicotine could be delivered to the body were primary factors in getting someone addicted to nicotine and that its patented "nicotine salt" formulation was designed to maximize both factors.

176.    Because of JUUL Labs' patents and the confidentiality it maintained concerning its business practices, such information was not readily available to Plaintiff and the members of the proposed class.  Plaintiff and the members of the proposed class would not have been able to discover, much less comprehend, such information by the exercise of ordinary diligence.

177.    JUUL Labs' marketing and promotional efforts depicted the use of its products to show themes of independence, adventurousness, sophistication, glamour, athleticism, social inclusion, sexual attractiveness, thinness, popularity, rebelliousness, and "being cool."

178.    JUUL Labs, however, stayed silent on what it knew to be the true state of affairs, *i.e.*, that the use of its products would bring nicotine addiction (and an ever increasing need for the absorption of more nicotine to keep up with the addiction's growth) and any number of other adverse consequences.

179.    In taking up the designing, manufacturing, and sale of its vaping devices and flavored JUULpods, JUUL Labs knew or should have known that the consumption and absorption of nicotine brings about, among other things, long-term, detrimental maturational effects at critical stages of brain development, epigenetic changes, cognition and emotional regulation problems, physiological changes (including adverse effects on the heart, reproductive system, respiratory processes, and cardiovascular system), and the risk of seizures, coronary vascular disease, peripheral arterial disorders, and chronic obstructive pulmonary disease.

180.    But JUUL Labs shared none of this with Plaintiff and the members of the proposed class.

181.    Rather, JUUL Labs marketed and promoted its nicotine products with youth-oriented imagery and messaging with bold coloring, attractive and youthful models, depictions of people laughing and having fun, and images of social popularity and acceptance.

182.    JUUL Labs intended that its concealment and/or omission of the material facts concerning the harmful and dangerous nature of its products be relied on so that Plaintiff and the members of the proposed class and other consumers would buy JUUL Labs' products.

183.    As a result of JUUL Labs' concealment and/or omission of these material facts, Plaintiff and the members of the proposed class was ignorant of the falsity of JUUL Labs' marketing and promotional efforts.

184.    Plaintiff and the members of the proposed class relied on JUUL Labs' concealment and/or omission of these material facts, and inasmuch as JUUL Labs engineered, designed, manufactured, and sold its products in the common marketplace, Plaintiff and the members of the proposed class had a right to rely on JUUL Labs' marketing and promotional messaging.

185.    In light of JUUL Labs' superior knowledge and information, concerning its own products, Plaintiff and the members of the proposed class had the right to rely on JUUL Labs to disclose the material facts about its products, including information about the harmful and dangerous effects of the use of its products.

186.    And in doing so, Plaintiff and the members of the proposed class was harmed and/or damaged, including becoming addicted to nicotine; respiratory problems, bouts of anxiety, and coughing fits; other physiological, emotional, and mental injury; significant exposure to toxic substances that have caused or contributed to cause, and may yet cause or contribute to cause, disease and injurious physical conditions; and economic harm.

## Count Nine
### Fraud

187.    Plaintiff incorporates by reference paragraphs 1 through 186 as though fully restated and set forth herein.

188.    JUUL Labs presented false representations as statements of fact for the purpose of selling its products.

189.    As set forth above, JUUL Labs has falsely represented material information about the addictive and adverse nature of its products, particularly material facts concerning nicotine content, addictiveness, and the physiological effects of the nicotine its JUULpods contained.  And, even when the presence of nicotine in JUULpods was known, JUUL Labs failed to disclose the truth about its amount, concentration, and effects.

190.    For instance, in its marketing and promotional messaging disseminated online and on social media platforms, JUUL Labs repeatedly represented that a JUULpod was essentially equivalent to a pack of cigarettes, but JUUL Labs knew the two were not comparable because the "nicotine salt" formulation in JUULpods accomplished more in terms of the speed and amount of

delivery of nicotine—both of which affect the efficacy of its addictiveness—than one pack of cigarettes ever has.

191.    In its labeling, and elsewhere, JUUL Labs represented its JUULpods as having 3% or 5% strength, but this is not an accurate representation of the true nicotine content: many interpreted the percentages to mean, for example, that the nicotine content in a JUULpod with 5% strength would be, by volume, 50 mg/mL, which is not an accurate conversion.  In truth, the concentration is nearly 20% higher: 59 mg/mL.

192.    Moreover, JUUL Labs' products have not been approved as a smoking therapy measure or smoking cessation device, but the products are routinely advertised in connection with JUUL Labs' "Switch" campaign as a safer, healthier alternative to smoking cigarettes.  The FDA found that, in essence, JUUL Labs' marketing, advertising, labeling of its products in this way, as if they were "modified risk tobacco products," violated the FD&C Act.

193.    In further violation of the FD&C Act, JUUL Labs "engaged in labeling, advertising, and/or other activities directed to consumers, in which JUUL explicitly and/or implicitly has represented that JUUL products are free of a substance, have a reduced level of or exposure to a substance, and/or that JUUL products present a lower risk of tobacco-related disease or are less harmful than one or more other commercially marketed tobacco products."

194.    JUUL Labs has also represented that its products are "totally safe," that they are "much safer than cigarettes," and that not only would the FDA "approve [their products] any day," but that the FDA was "about to come out and say … JUUL was 99% safer than cigarettes and that would happen very soon."

195.    JUUL Labs knew that its products were not as they were being represented, but they were made so that Plaintiff and the members of the proposed class and other consumers would

rely on the representations and be persuaded to purchase JUUL Labs' products.

196.    Plaintiff and the members of the proposed class relied on JUUL Labs' statements to his detriment, including becoming addicted to nicotine; respiratory problems, bouts of anxiety, and coughing fits; other physiological, emotional, and mental injury; significant exposure to toxic substances that have caused or contributed to cause, and may yet cause or contribute to cause, disease and injurious physical conditions; and economic harm.

### Count Ten
### Unjust Enrichment

197.    Plaintiff incorporates by reference paragraphs 1 through 196 as though fully restated and set forth herein.

198.    Believing JUUL Labs' representations concerning its products to be true, and being unaware of the material information JUUL Labs omitted and withheld concerning the nicotine content, concentration, and effects of the liquid in JUULpods, Plaintiff and the members of the proposed class repeatedly and routinely purchased and used JUUL vaping devices and JUULpods.

199.    JUUL Labs knew that their marketing, promotional, and sales practices were inducing such purchases, leading to substantial revenue increases.

200.    And JUUL Labs accepted and retained such benefit knowing all the while that the purchasers of its products, including youth, did not know that use of the products would lead to the adverse consequences set forth above.

201.    In short, JUUL Labs exploited Plaintiff and the members of the proposed class for its own unjust enrichment and the detriment of Plaintiff and the members of the proposed class.

202.    Under the circumstances, it would be against equity and good conscience to permit JUUL Labs to retain the ill-gotten benefits it received.  Thus, it would be unjust and inequitable for JUUL Labs to retain the benefit without restitution to Plaintiff and the members of the proposed

class for the monies paid to JUUL Labs for its defective JUUL products.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the members of the proposed class respectfully request that this Court enter judgment against JUUL Labs, awarding the following relief:

(i)     a trial by jury on all issues;

(ii)    actual and/or compensatory damages, including the amounts Plaintiff and the members of the proposed class paid for JUUL Labs' products;

(iii)   the establishment and funding of a medical-monitoring program;

(iv)   restitution and disgorgement of profits;

(v)    punitive damages in an amount that is fair and reasonable, but that will serve to deter JUUL Labs and others from like conduct in the future;

(vi)   attorneys' fees and costs available under the law;

(vii)  pre and post judgment interest; and

(viii) such other and further relief, at law or in equity, as this Court deems just and proper.

Respectfully submitted,
**SCHLICHTER, BOGARD & DENTON, LLP**


*/s/ Andrew D. Schlichter*
Andrew D. Schlichter, USDCSDNY #AS8063
aschlichter@uselaws.com
Jerome J. Schlichter, MO #32225
jschlichter@uselaws.com
Kristine K. Kraft, MO #37971
kkraft@uselaws.com
Scott H. Morgan, MO #61853
smorgan@uselaws.com
100 South 4th Street, Suite 1200
St. Louis, Missouri 63012
(314) 621-6115
(314) 621-6151 (fax)


***Attorneys for Plaintiff***